# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
CAMPANELLA, HERRING, PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist ADRIAN E. SOSA**
**United States Army, Appellant**

ARMY 20140869

Headquarters, 7th Infantry Division
Samuel A Schubert, Military Judge
Colonel Robert F. Resnick, Staff Judge Advocate

For Appellant:  Captain Joshua G. Grubaugh, JA (argued); Colonel Mary J. Bradley, JA; Lieutenant Colonel Jonathan F. Potter, JA; Captain [sic] Christopher D. Coleman, JA; Captain J. David Hammond, JA (on brief); Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on reply brief).

For Appellee:  Captain Tara O'Brien Goble, JA (argued); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A. G. Courie III, JA; Captain Tara E. O'Brien, JA (on brief); Major Michael E. Korte, JA.

28 October 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of two specifications of willful disobedience of a superior commissioned officer and one specification of aggravated assault, in violation of Articles 90 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 890, 928 (2012) [hereinafter UCMJ].  The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for twelve months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

We review this case under Article 66(c), UCMJ.[1]  Appellant assigns three errors that merit discussion and relief.  For reasons discussed below, we hold:  the

---

[1] We heard oral argument in this case on 21 September 2016.

evidence was legally and factually insufficient with respect to the aggravated assault conviction; under the facts of this case, the military judge erred in denying the defense motion to exclude evidence regarding the victim's Human Immunodeficiency Virus (HIV) diagnosis; and, the military judge erred in instructing the panel regarding the risk of harm in the context of a "means likely" aggravated assault.

We have considered the matters personally raised by appellant under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). They lack merit.

## BACKGROUND

On 8 August 2012, preventive medicine officials at Joint Base Lewis-McChord notified appellant's company commander that appellant had tested positive for HIV. That same day, the commander took appellant to the preventive medicine office, where appellant was personally informed of this diagnosis. The commander also personally counseled appellant that day, ordering him to inform any future sex partners of his HIV status before engaging in sexual intercourse and to use condoms when engaging in sexual intercourse with future partners.

Specialist (SPC) SS, the victim in this case, testified he engaged in sexual intercourse with appellant approximately five times, beginning in mid-September 2012 and ending in early October 2012. Specialist SS testified he asked appellant if he was "clean," and appellant indicated he was. According to SPC SS, appellant did not disclose his HIV status until several months after they had become sexually involved. Specialist SS testified the intercourse consisted of appellant placing his penis in and ejaculating in SPC SS's anus. On three occasions, the intercourse occurred in appellant's barracks room. Appellant used a condom on these three occasions. On one of these occasions, however, the condom broke. On two other occasions, intercourse occurred in appellant's shower and a condom was not used on either occasion.

Before trial, defense counsel moved the military judge to exclude evidence that SPC SS tested positive for HIV eight months after his last sexual encounter with appellant. Citing Military Rule of Evidence [hereinafter Mil. R. Evid.] 402, the military judge summarily denied the defense motion; he also ruled under Mil. R. Evid. 412 that, if government counsel presented evidence of SPC SS's HIV-positive status,[2] defense counsel could present evidence regarding his sexual activity with another partner, MB, in order to show appellant was not the source of SPC SS's virus.

---

[2] The military judge described SPC SS's HIV-positive status as "marginally relevant."

Specialist SS testified he tested negative for HIV in September 2012 as part of predeployment processing, but he began experiencing fatigue and nausea after deploying to Afghanistan in November 2012. During redeployment processing in June 2013, he tested positive for HIV. Specialist SS testified he confronted appellant afterward, and appellant said he had hoped SPC SS did not contract HIV from him; he also testified appellant later apologized for transmitting HIV to him. On cross-examination, SPC SS testified he also had a sexual relationship with MB, his domestic partner, which ended in February 2013.

Special Agent (SA) NB testified as a government witness. In May 2014, appellant told SA NB he engaged in sexual intercourse with SPC SS in June and July 2012. He described appellant as "evasive," however, when pressed with focused questioning about whether he and SPC SS engaged in intercourse after appellant's August 2012 HIV-positive result. Appellant ultimately said yes. When asked if his relationship with SPC SS continued until shortly before his deployment into September and October 2012, appellant nodded his head. On cross-examination, SA NB acknowledged interviewing SPC SS and learning therefrom that MB may have been the source of his HIV infection.

Doctor SP testified as a government expert in the field of "laboratory HIV diagnosis." Before so recognizing her, the military judge asked about her qualifications, and Dr. SP responded, *inter alia*, "I am not a physician. I classify specimens." She described in detail the procedures used to confirm the presence of the virus in appellant's blood sample, the results of which the defense did not dispute. However, over defense objection that such testimony was beyond the scope of her expertise, Dr. SP was allowed to describe possible ways HIV might be transmitted, including sexual intercourse. When asked whether anal intercourse, including ejaculation, "could . . . lead to a transmission event," she responded, "[i]f there were virus in the semen and a breach in the actual integrity of the membrane, yes."

Following brief cross-examination, the military judge asked whether "viral loads have anything to do with the strength of an ability for transmission?" Dr. SP said, *inter alia*:

> And what we know is that the higher the viral loads, there is more likely--there is the potential, I would say, the potential for a transmission event. Some individuals, and this is not my area of expertise, would give you a one in X number chance. And I would not do that. I would just say that those with viremia have a higher propensity or potential to transmit.

Trial counsel followed up on this line of questioning by asking Dr. SP to describe appellant's viral load. She testified it was "15,988 copies."[3] Asked whether that was high or low, Dr. SP said:

> I consider high viral loads--most people consider--well, laboratorians, let me say, laboratorians consider a high viral load where we are going to raise our hand at 10,000 copies. It is now by [World Health Organization] considered 1000 copies. That will initiate a change in therapy.

Asked by government counsel whether appellant's viral load could affect his "ability to transmit the virus," Dr. SP said appellant "certainly could transmit the virus at that level."

A panel member then asked whether a person with HIV could have unprotected sex without transmitting the virus, and Dr. SP responded:

> Yes, sir. The epidemiological literature actually would give a 1 in, I believe the current is 256 colloidal events. I mean, yes you can--but it would also be dependent on a multiplicity of factors of which we have no knowledge. Was a there a breech in the skin? What was the viral load? Et cetera. But it is certainly possible. We have discordant couple research which actually confirms that. One partner is infected, the other partner is uninfected. And we know from research on those couples that it is possible without protection although they are encouraged to use barrier protection, that on an interval number of times that you could have sexual intercourse and not have a transmission event. So it is, certainly it is possible.

Before submitting the case to the panel for deliberation, the military judge instructed them on the elements of the charged offenses. Regarding aggravated assault, the military judge said, inter alia:

> The likelihood of death or grievous bodily harm is determined by measuring two factors. Those factors are; one, the risk of the harm and two, the magnitude of the harm. In evaluating the risk of the harm, the risk of death

---

[3] The witness did not explain, nor do we understand, what she meant by "copies."

or grievous bodily harm must be more than merely a fanciful, speculative, or remote possibility.

[...]

Where the magnitude of the harm is great, you may find that an aggravated assault exists even though the risk of harm is statistically low. For example, if someone fires a rifle bullet into a crowd and a bystander in the crowd is shot, then to constitute an aggravated assault, the risk of harm of hitting that person need only be more than merely a fanciful, speculative, or remote possibility since the magnitude of harm which the bullet is likely to inflict on that person is great if it hits the person.

During closing argument, government counsel said:

[H]ope is not a prophylactic, it is not a means of preventing the spread of a public health threat. In this case, a public health threat so serious that it warrants its own regulation as to what procedures should be followed when a soldier's determined to have that illness. These procedures, this regulation, all these things are designed to prevent precisely the situation with which this court is faced today. The uncontrolled transfer of the HIV virus to an unknowing Soldier before that Soldier deploys to a hostile fire zone.

[. . .]

Now, there's been a lot of testimony about [SPC SS] being HIV positive, but I want you to note that it is not required for the government to prove that transmission ever occurred in order for a crime to be completed in this case, because we're talking about is this unlawful exposure without informing your partner. And, in fact, [Dr. SP] testified that you can [have] many such exposure events without a transmission occurring. However, on the flipside, in a case like today where you have direct evidence of a transmission, members, that's pretty darn good evidence that an exposure did, in fact, take place.

[. . .]

5

> And I also want to touch on means or force likely to produce grievous bodily harm. Now, because we come in and we sit down in a panel box does not mean that we have to check our common sense at the door. We all have certain knowledge about the world an about how things work in the world. And I ask you to apply that knowledge in addition to applying the testimony that you heard today. If you hear testimony that someone is shot, you don't need someone else to come up and tell you that that's going to cause grievous bodily harm. We have the common knowledge required to come to that conclusion. This is no different just because instead of a bullet we have a virus.

After the panel found appellant guilty of all charges and specifications, the parties presented their pre-sentencing cases. The government called NS, SPC SS's husband, who described HIV's effects on SPC SS. Specialist SS was then recalled and also described the virus's effects. Government counsel focused on SPC SS's HIV-positive status during sentencing argument, saying *inter alia*:

> Specialist Sosa gave a potentially fatal disease to [SPC SS].
>
> [. . .]
>
> In this case HIV is spread. You've heard the consequences of HIV today. And as you know, [SPC SS] is HIV positive.
>
> [. . .]
>
> Although that was not the purpose of this court-martial, there is extremely strong circumstantial evidence, that Specialist Sosa gave [SPC SS] the virus through his reckless actions.
>
> [. . .]
>
> He knew of the dangers of spreading HIV and he knew he could have easily transferred it, the disease, through his sexual intercourse, but he did it anyway.
>
> [. . .]

6

> The United States and the United States Army lost two
> Soldiers as a result of [appellant's] actions, [SPC SS] and
> Specialist Sosa.
>
> [. . .]
>
> Now, most importantly you need to think about [SPC SS],
> the victim of his aggravated assault. Now, the government
> concedes that this is 2014 and not 1994, not 1984, there is
> treatment for HIV, but the treatment has consequences,
> and we've heard about those consequences today. We
> heard from the consequences that [SPC SS] experience[s]
> just right now; diarrhea, pain, terror, fear. There is
> treatment, but there is no cure, there is no cure right now,
> there's a lifetime of medication with side effects, doctors
> check ins for three to four months for the rest of his life,
> the social stigma, the expenses, and I'm going to go back
> to it again, the fear, the uncertainty, the unknown, to
> having to check every single day and be aware every
> single day. It's that fear that [SPC SS] will transfer the
> disease to his husband or another innocent bystander, or
> that it'll take his life.
>
> Now, beyond that fear, you've heard today that [SPC SS]
> wants to have a biological child, there's a 50 percent
> chance that child's going to get HIV as w[e]ll. Specialist
> Sosa took that away from him. He had no right to take
> that away from him. It's a burden that Specialist Sosa
> had, and it's now a burden that [SPC SS] involuntarily has
> to bear from now on, all because Specialist Sosa chose not
> to disclose his status.

## DISCUSSION

### A. Legal and Factual Sufficiency

In accordance with Article 66(c), UCMJ, we review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (internal citations omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). In resolving questions of legal

sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

Our superior court's decision in *United States v. Gutierrez*, 74 M.J. 61 (C.A.A.F. 2015) controls the result here. In *Gutierrez*, our superior court assessed as legally insufficient a "means likely" aggravated assault conviction in which an HIV-positive servicemember engaged in sexual activity with persons unaware of his medical condition. The evidence in that case established at most—during acts of unprotected sexual intercourse—a 1-in-500 chance that Gutierrez would transmit the virus. *Id.* at 63. Our superior court concluded that a 1-in-500 transmission risk was insufficient to establish the appellant engaged in conduct likely to inflict grievous bodily harm or death. *Id.*

Dr. SP's testimony constitutes the only evidence before us regarding the scientific analysis regarding risk of harm. We find Dr. SP's testimony describing a 1-in-256 chance of HIV transmission to be fundamentally unreliable and outside the scope of her expertise as a laboratorian. Moments earlier she testified "*this is not my area of expertise*," regarding HIV transmission risk. We hold the military judge erred by allowing this testimony.

Even if we assume Dr. SP was qualified to render such expert testimony, no rational factfinder could conclude therefrom that appellant's conduct constituted a "means likely" to inflict grievous bodily harm or death. *Id.* at 66.

### B. Evidence of SPC SS's HIV infection

We review a military judge's decision regarding admissibility of evidence for an abuse of discretion. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015). However, we accord less deference to a trial judge's decision when he does not articulate his reasoning for it. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

The government posits that appellant's aggravated assault conviction is legally and factually sufficient, because the fact that appellant transmitted HIV to

SPC SS can be considered in determining the risk of harm. We decline to adopt such circular reasoning and disagree with the underlying premise.[4]

We know SPC SS acquired HIV. However, assuming this fact was relevant, we agree with the military judge that its probative value was, *at most,* marginal. Against this slight probative value, we find substantial risks to appellant's right to a fair trial, where the government did not prove he caused SPC SS's HIV infection.

Indeed, defense counsel's concern about this information came to fruition, for a virtual mini-trial developed, featuring multiple proposed inquiries from the panel focused on whether appellant actually transmitted the virus to SPC SS. Lest we doubt that this case veered from its legally relevant course, we consider the following passage from government counsel's closing argument as conclusive proof that it did so:

> These procedures, this regulation, all these things are designed to prevent *precisely the situation with which this court is faced today. The uncontrolled transfer of the HIV virus* to an unknowing Soldier before that Soldier deploys to a hostile fire zone.[5]

(Emphasis added.).

Balancing the interests under Mil. R. Evid. 403, we conclude the military judge abused his discretion in denying the defense motion to exclude evidence of SPC SS's HIV infection, for any probative value therein was substantially outweighed by the danger of unfair prejudice and confusion of the issues.

### C. Instructional Error

The instructions regarding aggravated assault were incorrect, because the panel was informed "the risk of death or grievous bodily harm must be more than merely a fanciful, speculative, or remote possibility." Our superior court has held

---

[4] The government's appellate brief argues the court-martial established beyond a reasonable doubt that appellant was the source of SPC SS's HIV infection. Considering the absence of forensic evidence regarding any relation between appellant's and SPC SS's viral infections, we reject this view. *Contrast State v. Schmidt*, 99-1412 (La. App. 3 Cir. 7/26/2000), 771 So.2d 131, *cert. denied*, *sub nom Louisiana v. Schmidt*, 535 U.S. 905 (2002).

[5] Trial counsel later argued the case included "direct evidence of a transmission."

such a definition of risk is erroneous. *Gutierrez*, 74 M.J. at 66. In another case where the pre-*Gutierrez* instruction was given and the appellant challenged the sufficiency of the evidence, this court twice upheld the finding of guilty to aggravated assault, the second time using the new standard post-*Gutierrez*. *United States v. Pinkela*, ARMY 20120649, 2015 CCA LEXIS 254, at *5 (Army Ct. Crim. App. 11 Jun. 2015) (summ. disp.). The facts in *Pinkela* were more egregious than both *Gutierrez* and this case. The accused, who had a significant viral load, had unprotected anal intercourse with the victim after causing rectal bleeding by inserting a metal shower enema into the victim's anus against his will. *Id*. at 4. Despite this court's application of the new standard post-*Gutierrez*, our superior court returned the case to this court a third time after issuing an order affirming only the lesser-included offense of assault consummated by battery. *United States v. Pinkela*, ARMY 20120649, 2016 CCA LEXIS 8, at *2 (Army Ct. Crim. App. 7 Jan. 2016) (summ. disp.).

The question of whether appellant's misconduct was "likely" to grievously injure SPC SS was a matter of significant dispute. The instructional error amounted to a denial of due process, because it incorrectly described an element of aggravated assault in a manner that reduced the government's burden of proof. *United States v. Tauala*, 75 M.J. 752, 756 (Army Ct. Crim. App. 2016). Therefore, we must assess whether this constitutional error was harmless beyond a reasonable doubt. *Id*. We conclude the error resulted in prejudice, for we cannot be confident under the facts and circumstances that the error did not contribute to the panel's finding appellant guilty of Specification 1 of Charge I.

## CONCLUSION

We AFFIRM only so much of the finding of guilty of Specification 1 of Charge I as finds:

> [appellant] did, at or near Joint Base Lewis-McChord, Washington on divers occasions between on or about 5 September 2012 and 30 October 2012, commit an assault upon Private First Class SS by engaging in unprotected sexual acts and sexual contact with the said Private First Class SS, while knowingly infected with HIV.

The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and

SOSA—ARMY 20140869

*United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). We AFFIRM only so much of the sentence as provides for a bad-conduct discharge.

All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by our decision, are ordered restored. *See* UCMJ arts. 58b(c), and 75(a).

Senior Judge CAMPANELLA and Judge HERRING concur.

FOR THE COURT:

JOHN P. TAITT
Acting Clerk of Court

11